UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

No. 09-3339-TEB

UNITED STATES OF AMERICA

vs.

OSCAR ROSALES,

    Defendant.
_____/

## CRIMINAL COVER SHEET

1. Did this matter originate from a matter pending in the Northern Region of the United States Attorney's Office prior to October 14, 2003? _____ Yes __x__ No

2. Did this matter originate from a matter pending in the Central Region of the United States Attorney's Office prior to September 1, 2007? _____ Yes __x__ No

                                      Respectfully submitted,

                                      R. ALEXANDER ACOSTA
                                      UNITED STATES ATTORNEY

BY: _____
        ADAM S. FELS
        ASSISTANT UNITED STATES ATTORNEY
        Court No. A5501040
        99 N. E. 4th Street
        Miami, Florida  33132-2111
        TEL (305) 961-9325
        FAX (305) 536-7213

AO91 (Rev. 12/03) Criminal Complaint

# UNITED STATES DISTRICT COURT

SOUTHERN         DISTRICT OF         FLORIDA

UNITED STATES OF AMERICA
V.
OSCAR ROSALES

**CRIMINAL COMPLAINT**

Case Number: 09-2339-TEB

(Name and Address of Defendant)

I, the undersigned complainant state that the following is true and correct to the best of my knowledge and belief. On or about __3/5/2009__ in __Miami-Dade__ County, in the __Southern__ District of __Florida__ defendant(s) did,

*(Track Statutory Language of Offense)*

transport, transmit, transfer, and attempted to transport, transmit, or transfer monetary instrument or funds from a place in the United States to or through a place outside the United States knowing that the monetary instrument or funds involved represented the proceeds of some form of unlawful activity and knowing that such transportation, transmission, or transfer is designed in whole or in part to conceal or disguise the nature, the location, the source, the ownership, or the control of the proceeds of a specified unlawful activity; and conspiracy to violate same

in violation of Title __18__ United States Code, Section(s) __1956(a)(2), 1956(h)__.

I further state that I am a(n) __Special Agent, ICE__ and that this complaint is based on the following facts:

see attached affidavit

Continued on the attached sheet and made a part of this complaint:  ☑ Yes  ☐ No

Signature of Complainant

Carlos Martinez, Special Agent, ICE
Printed Name of Complainant

Sworn to before me and signed in my presence,

3/17/2009                              at    Miami              FL
Date                                         City               State

Hon. Ted E. Bandstra      U.S. Magistrate
Name of Judge             Title of Judge            Signature of Judge

## AFFIDAVIT IN SUPPORT OF CRIMINAL COMPLAINT

I, Carlos Martinez, a special agent with the Department of Homeland Security (DHS), Immigration & Custom Enforcement (ICE), being duly sworn, deposes and states:

### INTRODUCTION

1. I am currently employed as a special agent with the Department of Homeland Security, Immigration & Customs Enforcement (ICE), Office of Investigations. I have been a criminal investigator for approximately seven years. I am presently assigned to a group responsible for conducting money laundering investigations.

2. The facts set forth below are facts known to me personally and upon information acquired from others, including other law enforcement officers. This affidavit is being submitted for the limited purpose of supplying probable cause for the issuance of a Criminal Complaint against defendant Oscar ROSALES. As such, this affidavit does not contain all facts known to me regarding this investigation.

### FACTS

3. At or around July of 2008, a cooperating witness (CW) working with ICE law enforcement officers met Oscar ROSALES, and learned that ROSALES wanted to move proceeds from illicit activities between countries. Continuing in July 2008, ROSALES called the CW and stated that he wanted to move approximately eight million dollars out of Mexico and into Colombia. Agents identified ROSALES, who is a Colombian national who conducts significant international travel.

4. On or about August 7, 2008, the CW introduced ROSALES to an ICE undercover officer (UC) in Miami, Florida. At this meeting, ROSALES told the UC and the CW that the

"owner" of the money believed in him. ROSALES further stated that he had business around the globe. ROSALES also stated that he had spoken with one of the "MERO-MERO" about the business. I have learned, after consulting with law enforcement officers, that the term "MERO-MERO" refers to the leader or top individual of a drug trafficking organization.

4. From on or about July 22, 2008 through on or about January 20, 2009, ICE special agents, in coordination with other law enforcement agencies, collected or caused to be collected over two million U.S. dollars in various locations around the world including Mexico, Spain, Canada and the United States, which ROSALES had identified needed to be picked up. These funds were then placed into covert account(s) in Miami, Florida, then were provided at ROSALES' direction to either accounts ROSALES could access or were wire transferred to accounts which ROSALES provided to the UC.

5. Throughout this period, both the UC, other UCs and the CW met with ROSALES on a number of occasions.

6. On or about August 28, 2008, ROSALES met with another ICE undercover officer (UC) in Miami, Florida. At this meeting, ROSALES stated that he could deliver money twice a week in Mexico and once a week in Spain and Canada. ROSALES further stated that he met with the owners of the money at the beginning of the month and that they wanted to work with him exclusively.

7. Also at this meeting on or about August 28, 2008, ROSALES asked the UC if he had any buyers in Rome, Italy because he was going to have his own business there. When the UC asked ROSALES what type of business he was referring to, ROSALES proceeded to touch his nose, indicating that the business was, in fact, narcotics trafficking. The UC responded that he did not

engage in this kind of business, but only engaged in the "money side" and does not mix the two together. The UC indicated that he would try to find ROSALES a buyer in Italy.

8. On or about October 2, 2008, ROSALES called the CW and asked if the CW could receive 100 kilos. Later that day, when the CW called ROSALES back, ROSALES informed the CW that he had already moved the merchandise. Based on my training and experience, and based on the information already gathered during the investigation, I believe that ROSALES was referring to shipment of narcotics.

9. On or about October 17, 2008, ROSALES met with the UC in Miami, Florida to discuss moving illicit proceeds from abroad. ROSALES further acknowledged that all the money in Europe was proceeds of drug trafficking. ROSALES also spoke of a shipment between 50 and 100 units. Based on my training and experience, and based on the information already gathered during the investigation, I believe that ROSALES was referring to shipment of narcotics.

10. On or about November 1, 2008, ROSALES called the CW and stated that he was looking for a buyer of approximately 300 kilos. Based on my training and experience, and based on the information already gathered during the investigation, I believe that ROSALES was again referring to narcotics. ROSALES further stated to the CW that he would like to move approximately $15 million out of Mexico. Also during this conversation with the CW on or about November 1, 2008, ROSALES stated that he had lots of work because he had developed a contact with a "MERO-MERO," like Pablo ESCOBAR. Based on my experience and based on conversations with other law enforcement officers, I am aware that Pablo ESCOBAR was one of the largest narcotics traffickers in history; thus, I believe that ROSALES's reference to ESCOBAR means that ROSALES had developed a contact with a large narcotics trafficker.

11. On or about December 8, 2008, ROSALES and the UC discussed details over the telephone and e-mail about one of the bank accounts ROSALES had provided to the UC in order to move approximately $300,000 that was collected in Canada on or about December 1, 2008. ROSALES stated that in order to withdraw the money that was originally wire transferred to this account the bank required a letter that explained the money was a "donation." ROSALES further stated that the owner of the money delivered the money on Monday and expected it on Tuesday; they were not interested on how he, ROSALES, does it.

12. On or about January 16, 2009, ROSALES told the UC that he had approximately $200,000 available for pickup in Los Angeles, California. On or about January 20, 2009, approximately $200,000 was picked up in a parking lot from an individual in Los Angeles, California. Continuing on or about January 21, 2009, after further conversations between the UC and ROSALES regarding the pickup of additional money, approximately $150,000 was picked up from the same individual in Los Angeles, California. This money was placed in a Miami, Florida covert account(s).

13. On or about January 22, 2009, at ROSALES' direction, the UC caused to be wire transferred approximately $200,000 collected in Los Angeles to various U.S. bank accounts which ROSALES had provided. Also on or about January 22, 2009, ROSALES provided wire transfer instructions and additional U.S. and foreign bank accounts for the approximately $150,000 that was picked up on or about January 21, 2009.

14. On or about January 23, 2009, at ROSALES' direction, the UC caused to be wire transferred approximately $150,000 collected in Los Angeles to various U.S. and foreign bank accounts which ROSALES had provided.

15. On or about January 26, 2009, after further conversations between the UC and ROSALES regarding the pickup of additional money, approximately $155,000 was picked up from the same individual in Los Angeles, California. This money was also placed in Miami, Florida covert account(s).

16. On or about January 27, 2009, ROSALES e-mailed wire transfer instructions and additional foreign bank accounts for the approximately $155,000 that was picked up on or about January 26, 2009.

17. On or about January 28, 2009, at ROSALES' direction, the UC caused to be wire transferred approximately $155,000 collected in Los Angeles to various foreign bank accounts which ROSALES had provided.

18. On or about February 3, 2009, after conversations between the UC and ROSALES regarding the pickup of Canadian money, approximately 514,000 Canadian dollars was picked up from the same individual in Los Angeles, California. This money was also placed in Miami, Florida covert account(s).

19. Between on or about February 11 and February 16, 2009, ROSALES e-mailed wire transfer instructions and additional United States and foreign bank accounts for the approximately 514,000 Canadian dollars that was picked up on or about February 3, 2009.

20. On or about February 18, 2009, at ROSALES' direction, the UC caused to be wire transferred approximately $372,000 U.S. dollars (out of the 514,000 Canadian dollars collected in Los Angeles) to various United States and foreign bank accounts which ROSALES had provided.

21. On or about February 25, 2009, ROSALES contacted the UC via e-mail and told him that he would personally travel to California and deliver an additional approximately $350,000. On

or about March 4, 2009, an additional approximately $305,000 was picked up in San Diego, California from the same individual who had delivered the previous money in Los Angeles, California. This money was also placed in Miami, Florida covert account(s).

22. On or about March 5, 2009, ROSALES e-mailed the UC wire transfer instructions and additional U.S. and foreign bank accounts for the approximately $305,000 that was picked up on or about March 4, 2009.

23. Between on or about March 9 and March 12, 2009, at ROSALES' direction, the UC caused to be wire transferred approximately $289,000 to various United States and foreign bank accounts which ROSALES had provided.

24. On or about March 13, 2009, ICE special agents, in coordination with other law enforcement agencies, collected or caused to be collected approximately $1,000,000 Canadian dollars in Toronto, Canada that ROSALES had identified needed to be picked up.

25. On or about March 16, 2009, the UC met with ROSALES in Miami, Florida. During this meeting, the UC asked ROSALES if the money was from Canada was from "material." ROSALES stated yes and that "they" wanted him (ROSALES) to invest in the business. When the UC asked if it was the same people as from Italy (see paragraph 7, above), ROSALES said it was another group that also wanted ROSALES to invest in their operation. ROSALES stated that he was tired of being everyone's banker and wanted to "make the jump." ROSALES further stated that he, ROSALES, has the network to do this. ROSALES then offered to introduce the UC to meet "his people" in Cartagena, Colombia in a couple of months and boasted that he (ROSALES) was the #2 person in this business. Based on my training and experience, and the information already obtained during this investigation, I believe that ROSALES is stating that he is ready to make the jump into

the narcotics business.

## CONCLUSION

26. Based upon the foregoing, I believe that there is probable cause to believe that ROSALES has violated Title 18, United States Code, Section 1956(a)(2) by, among other things, transporting, transmitting, transferring, or attempting to transport, transmit, or transfer monetary instruments or funds from a place in the United States to or through a place outside the United States or to a place in the United States from or through a place outside the United States with the intent to promote the carrying on of a specified unlawful activity or knowing that the monetary instrument or funds involved in the transportation, transmission, or transfer represent the proceeds of some form of unlawful activity and knowing that such transportation, transmission, or transfer is designed in whole or in part to conceal or disguise the nature, the location, the source, the ownership, or the control of the proceeds of a specified unlawful activity. I also believe that ROSALES has violated Title 18, United States Code, Section 1956(h) by conspiring to commit a violation of Title 18, United States Code, Section 1956(a)(2).

**AFFIANT SAYETH FURTHER NAUGHT.**

_____
Carlos Martinez
Special Agent
U.S. Immigration and Customs Enforcement

Sworn to and subscribed before me this
17th day of March, 2009.

_____
TED E. BANDSTRA
UNITED STATES MAGISTRATE JUDGE